UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KENNETH PAUL YORK,<br><br>          Plaintiff,<br><br>     v.<br><br>CLARK E. DUCART,<br><br>          Defendant. | Case No. 15-cv-01521-EMC<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

Petitioner Kenneth Paul York was convicted by a jury of first-degree murder, attempted residential robbery, residential burglary, and assault with a firearm. The jury also found true the special circumstance allegation that the murder was committed while Mr. York was engaged in the commission or attempted commission of the crimes of burglary and robbery. Mr. York was sentenced to life without the possibility of parole, plus three years in state prison. Currently pending before the Court is Mr. York petition for a writ of habeas corpus, brought pursuant to 28 U.S.C. § 2254. In the petition, Mr. York seeks to have his conviction vacated on the grounds that his trial counsel provided ineffective assistance. Having considered the parties' briefs and accompanying submissions,[1] the Court hereby **DENIES** Mr. York's petition.

## I. FACTUAL & PROCEDURAL BACKGROUND

Mr. York was convicted of a crime that took place at approximately 1:10 a.m. on May 10, 2004, at an apartment in Pleasant Hill, California.[2] The testimony at his trial has largely been

---

[1] With respect to his traverse, Mr. York has moved for leave to file excess pages. The state has not opposed the motion. Accordingly, that motion is hereby **GRANTED**.

[2] Although the crime took place in 2004, Mr. York was not arrested and charged until several years later, after a person (Lenny Cabrera, also known as Marco Cabrera) gave investigators information suggesting that Mr. York was involved in the crime.

summarized by the California appellate court in its decision *People v. York*, No. A128201, 2012 Cal. App. Unpub. LEXIS 9153 (Cal. Ct. App. Dec. 17, 2012). To wit: Two people lived at the Pleasant Hill apartment where the crime took place, Merlin Fidler and James Connelly. Mr. Fidler was a seller of marijuana. Two people broke into the apartment, apparently to steal drugs and/or money, and Mr. Fidler was shot and killed. One of the persons, an African American man by the name of Tyson Morehead, was never caught. The other person was allegedly Mr. York. At trial, Mr. York tendered the theory that the second perpetrator was in fact a different person – a former friend of his – by the name of Junior Perez.

In support of its case, the prosecution had Mr. Fidler's roommate, Mr. Connelly, testify. Mr. Connelly had seen the second perpetrator during the crime, albeit briefly. When the police interviewed Mr. Connelly a few hours after the murder, Mr. Connelly stated that the second perpetrator was between 5'3" and 5'5" tall, which is close to the height of Mr. Perez. *See* RT 424. But shortly before the trial, Mr. Connelly changed this estimate and told the prosecution that the second perpetrator was between 5'6" and 5'8" tall, which is close to the height of Mr. York. *See* RT 426. Mr. Connelly explained: "I think I realized that [my initial estimate] was pretty inaccurate and gave it better thought." RT 429. At trial, Mr. Connelly also stated that Mr. York looked like the second perpetrator. RT 422. However, several years earlier, in November 2006, Mr. Fidler had been shown a photo lineup and had not been able to identify the second perpetrator. *See* RT 420-21, 460-61.

In addition to Mr. Connelly, the state offered multiple other witnesses in support of its case, including Mr. Perez and several of Mr. Perez's relatives, including Lauren Lackey (Mr. Perez's girlfriend at the time of the crime and now his wife), Tesse Perez (Mr. Perez's sister and Mr. York's girlfriend at the time of the crime), Logan Lackey (Ms. Lackey's brother), and Christopher O'Connor (Mr. Perez's cousin). Some of Mr. Perez's friends also testified, including Dave Anderson and Mr. Cabrera (the latter being the person who first gave investigators information suggesting that Mr. York was involved with the crime). Each of these persons implicated Mr. York, in some fashion, as the second perpetrator. For example:

*Mr. Perez.* Mr. Perez testified (after being granted immunity) that, during the relevant

period, he and Mr. York were friends,[3] *see* RT 887; that he and Mr. York were in business together dealing in marijuana, *see* RT 891-94; that he and Mr. York knew and talked about a marijuana dealer in Pleasant Hill (*i.e.*, Mr. Fidler), *see* RT 902; and that Mr. York talked about robbing that dealer. *See* RT 903.  Mr. Perez also testified that, the day before the crime – which was Mother's Day – Mr. York and Mr. Morehead were at Mr. Perez's apartment at about 3:00 p.m., where Mr. York again talked about robbing Mr. Fidler and that, at some point later during the day, Mr. York called and said he was staking out the dealer's house and had been doing so for about an hour.  *See* RT 914-16, 927-28, 981.

Mr. Perez further testified that Mr. York called him around 3:00 a.m. the following day (*i.e.*, several hours after the crime) while he was in bed with Ms. Lackey and asked him to come to Mr. York's house.  When Mr. Perez arrived, he saw Mr. York and Mr. Morehead standing there in shock.  Mr. York told Mr. Perez that "[s]hit went bad," and Mr. York asked Mr. Perez to take a duffel bag to a place in Nevada City that Mr. York and Mr. Perez co-owned.  RT 921-22, 985.  Mr. Perez agreed to do so, went back to his home with Ms. Lackey, and then left later that same morning to go to the Nevada City property with his friend, Mr. Anderson.  *See* RT 925-27.  According to Mr. Perez, Mr. York came to the Nevada City property later that day or the next, where he, in essence, confessed to Mr. Perez what had happened.  *See* RT 929, 931-32, 995-96, 1004 (Mr. Perez testifying that Mr. York said, "Shit went bad and the guy got shot" and that Mr. York showed him a newspaper article about the crime).  Mr. Perez also testified that Mr. York burned the contents of the duffel bag, which consisted of clothes and Mr. Morehead's wallet, and disposed of the gun that he had brought with him.  *See* RT 932-33, 936, 1005, 1007-09.

In addition to the above, Mr. Perez testified that, at some point after he had left the Nevada City property, Mr. York asked him to go to Mr. York's mother's house.  Mr. Perez did so, as did Mr. York, Ms. Lackey (Mr. Perez's then-girlfriend, now wife), and Ms. Perez (Mr. York's then-girlfriend and Mr. Perez's sister).  *See* RT 941.  According to Mr. Perez, Mr. York's mother, Jeannette York, told everyone "to go about our business, go to parties, make appearances, act like

---

[3] Some time after the murder, Mr. Perez and Mr. York had a falling out.  *See* RT 954.

nothing happened." RT 942-43. Ms. York also gave everyone a lawyer's business card and said, "If anyone comes to you to talk to you, to call him." RT 943. Either on that day or some day thereafter, Ms. York also told Mr. Perez, in the presence of Mr. York, that, "if Kenny [*i.e.*, Mr. York] gets in trouble, that I will be in trouble with him because I took the bag up to the property." RT 951.

Mr. Perez also indicated that, prior to the crime, Mr. York lived in Pleasant Hill but that, after the crime, Mr. York basically moved and lived at the Nevada City property. *See* RT 951-52.

*Ms. Lackey.* As indicated above, Ms. Lackey was Mr. Perez's girlfriend at the time of the crime and, at the time of trial, was his wife. She testified about Mr. Perez getting a phone call from Mr. York early in the morning after Mother's Day. *See* RT 723-24. She also testified about the meeting that Mr. York's mother held after the murder. *See* RT 750-51, 758-61.

*Ms. Perez.* As indicated above, Ms. Perez is Mr. Perez's sister and, at the time of the murder, she was Mr. York's girlfriend. At the time of trial, the two were no longer dating.[4] Ms. Perez testified that, shortly after the murder, Mr. York basically confessed to her that he had participated in the crime that resulted in Mr. Fidler's murder. *See* RT 1037-39, 1041-45. Ms. Perez also testified that Mr. York started living at the Nevada City property soon after the murder. *See* RT 1045-46. Finally, Ms. Perez testified about the meeting held by Mr. York's mother. *See* RT 1052-54.

*Mr. Cabrera.* Mr. Cabrera knew Mr. York but was closer to Mr. Perez. *See* RT 1117-18, 1121. Mr. Cabrera testified (after being granted immunity) that, several months before the crime, Mr. York talked to him about helping Mr. York rob someone (because Mr. Cabrera owed Mr. York money). Mr. York indicated that Mr. Perez would also help with the robbery, possibly as a driver (although Mr. Cabrera was uncertain on this point). *See* RT 1125-27. Approximately one week before the crime, Mr. York called Mr. Cabrera and told him that it was time and that Mr. York would pick him up from his house. But Mr. York never showed up, and Mr. York told Mr. Cabrera later that he found someone else to go with him. Mr. York also told Mr. Cabrera that "it

---

[4] It appears the two stopped dating around a year after the crime. *See* RT 1062.

went all bad," that the victim knew martial arts and was getting the best of him, and that, as a result, the victim was shot. RT 1128-32. At trial, Mr. Cabrera admitted that he could not remember how much about the murder he learned from Mr. York and how much from Mr. Perez. *See* RT 1149. Mr. Cabrera also admitted that he told the police something to the effect that he wanted to protect Mr. Perez. *See* RT 1157.

*Mr. Lackey.* Mr. Lackey was Ms. Lackey's brother. Mr. Lackey testified that he was living at the Nevada City property during the period in question, that Mr. Lackey saw a gun at the property that he had never seen before after Mr. York arrived at the property, that Mr. Lackey (and possibly others) shot the gun, and that Mr. York talked about getting rid of the gun. *See* RT 599, 602-05, 616. Several days or weeks later, after Mr. York had moved to the property to live there, Mr. Lackey asked Mr. York about the gun – "why he had to get rid of it" and "why he had let me touch it if something was wrong with it." RT 613-14. According to Mr. Lackey, Mr. York said "somebody got shot with the gun, he had to get rid of it. He didn't really tell me why [he] had let me handle it." RT 614.

The prosecution, however, did not rely solely on the testimony of Mr. Connelly, Mr. Perez, and Mr. Perez's relatives and friends. The prosecution also offered testimony from others who were staying at the Nevada City property on the day of the crime and the days thereafter. For example, Bryan Hart and Joel Olson testified. Mr. Hart and Mr. Olson were friends or acquaintances of both Mr. Perez and Mr. York (and not just Mr. Perez alone). Although there was some equivocation and/or backtracking by both witnesses, each provided testimony probative of Mr. York's guilt. For example, Mr. Hart heard Mr. York say something to the effect that something bad went down and that there was an African American man with him at the time. *See* RT 539-40. Mr. Hart also testified that, around this time, he saw a certain gun on the property; that he handled that gun; that, at some point, Mr. York left the property and came back; and that he did not see the gun again after Mr. York came back. *See* RT 541. Finally, both Mr. Hart and Mr. Olson indicated that they saw Mr. York burn some clothes at the property. *See* RT 536-37, 589, 656-57. In addition to Mr. Hart and Mr. Olson, neither of whom had a special allegiance to Mr. Perez over Mr. York, the prosecution offered the testimony of Penny Morales, who, if anything,

5

had an allegiance to Mr. York. *See* RT 1795 (Ms. Morales testifying that she and Mr. York were friends, that she was something of a mother figure for him, and that the two were "pretty close" and would confide in one another at times). Ms. Morales testified that about a conversation that she and Mr. York had a few years after the crime during which Mr. York told her that he had once committed a home invasion when he was younger. *See* RT 1804-05. Ms. Morales also testified about another conversation where Mr. York said he was upset that a friend of his had "ratted him out" to the police. *See* RT 1807-08, 1811.

After the evidence was submitted to the jury, the jury convicted Mr. York of, *inter alia*, first-degree murder. Mr. York then appealed, but his conviction was affirmed. *See generally id.* Mr. York appealed to the California Supreme Court, but again his conviction was affirmed. Subsequently, Mr. York filed a state habeas petition, in which he raised ineffective assistance of trial counsel. After ordering and considering informal briefing, the California Supreme Court summarily denied that petition. *See* Pet., Ex. B (order). Mr. York then filed the currently pending petition before this Court.

## II. DISCUSSION

A. Legal Standard

Mr. York's case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under AEDPA, habeas relief may be granted if the state court proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law as determined by the Supreme Court of the United States" or resulted in a decision that was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2).

Here, Mr. York takes the position that the California Supreme Court's rejection of his ineffective-assistance-of-counsel claim was an unreasonable application of clearly established Supreme Court law, *i.e.*, *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, there is ineffective assistance of counsel where (1) counsel's performance was deficient and (2) that deficient performance prejudiced the criminal defendant's defense. "To establish deficient performance, a person challenging a conviction must show that 'counsel's representation fell

below an objective standard of reasonableness.'" *Harrington v. Richter*, 562 U.S. 86, 104 (2011). "With respect to prejudice, a challenger must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.*

Of course, on habeas review, a court does not conduct a direct *Strickland* inquiry; rather, it is limited to the question of whether the state court's application of the *Strickland* standard was unreasonable. *See id.* at 101. As the Supreme Court has underscored, because

> [t]he standards created by *Strickland* and § 2254(d) are both "highly deferential," . . . when the two apply in tandem, review is "doubly" so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* at 105.

In the case at bar, the California Supreme Court did not articulate any specific rationale for its rejection of the ineffective-assistance-of-counsel claim, and therefore this Court "must determine what arguments or theories . . . could have supported[] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with" *Strickland*. *Id.* at 102 (emphasis added).

B.  Ineffective Assistance of Counsel

Mr. York contends that his trial counsel, Michael Cardoza, was ineffective in four ways:

(1) Trial counsel should have introduced cell phone records in his possession that would have contradicted Mr. Perez's testimony that Mr. York called him at 3:00 a.m. on May 10, 2004.

(2) Trial counsel should have called Mr. York's grandmother as a witness as she would have testified that Mr. York was at her house at the time of the murder and robbery, and Mr. York's mother and brother, if called as witnesses, would have corroborated her testimony.

1     (3)     Trial counsel should have introduced evidence that a newspaper article concerning the
2             crime was published on May 12, 2004, which would have damaged the credibility of
3             certain prosecution witnesses.
4     (4)     Trial counsel should have called James MacDonald as a witness, as he would have
5             contradicted the testimony of certain prosecution witnesses.

The Court addresses each of these arguments in turn, focusing first on the deficiency prong of *Strickland* and then turning to the prejudice prong.

C.      Deficient Performance

   1.    Cell Phone Records

According to Mr. York, his trial counsel properly asserted a defense that the second perpetrator was Mr. Perez but then failed to adequately put forth that defense because he failed to offer evidence that would have put into question Mr. Perez's alibi – *i.e.*, that the morning of the murder, Mr. Perez was in bed with his then-girlfriend Ms. Lackey. *See Alcala v. Woodford*, 334 F.3d 862, 870 (9th Cir. 2003) (stating that "[t]rial counsel made a sound strategic choice to present an alibi defense, but nonetheless failed in his duty to present that defense reasonably and competently").

As noted above, both Mr. Perez and Ms. Lackey indicated that Mr. York called Mr. Perez early in the morning after Mother's Day. In an interview with the police that took place in June 2007, Mr. Perez stated that Mr. York called his cell phone; he also indicated that he and Mr. York generally communicated through their cell phones rather than, *e.g.*, pagers. *See* Pet., Ex. C (Interview at 16).

Through a search warrant, the state was able to get the records for Mr. York's cell phone. Those records reflected that Mr. York did *not* make a phone call from his cell phone to Mr. Perez at 3:00 a.m. on May 10, 2004. *See generally* Pet., Exs. E-G. The state also attempted to get the records for Mr. Perez's cell phone, but no records were found for the time requested. *See* Pet., Ex. D at 92.

Although defense counsel, Mr. Cardoza, had in his possession the cell phone records for Mr. York, he did not introduce them at trial. Mr. York contends that, by failing to do so, counsel

8

provided ineffective assistance of counsel. Mr. York agrees that the fact that there was no record evidence of any phone records corroborating Mr. Perez's claim benefitted his defense. However, Mr. York argues, the fact that no call was made would have been affirmatively proven if his counsel had submitted his cell phone records to the jury – records which in fact showed no 3:00 a.m. call was made. Mr. York also asserts that there was no downside to submitting the cell phone records, and therefore there could have been no strategic reason for counsel not to offer the phone records.

The Court agrees that the failure of counsel to submit the cell phone records was deficient performance. Even if the California Supreme Court found to the contrary (as this Court assumes it did), that conclusion was not reasonable. There was no apparent strategic reason not to offer the phone records. Although the state hypothesizes that there could have been a strategic reason, it fails to offer any specifics as to what advantage Mr. York could have obtained by keeping the evidence away from the jury. *See* Ans. at 15 (stating that "respondent can only surmise that the reason why defense counsel would opine that it was better for the defense case if the jury did not see any telephone records is those records contained information that would have strengthened the prosecution's case or damaged the defense theory of the case").

The Court acknowledges that the evidence would not have conclusively established Mr. Perez was the second perpetrator. It is possible, for example, that Mr. York called Mr. Perez from another phone – *e.g.*, a landline or even Mr. Morehead's cell phone. And even assuming that Mr. York never called Mr. Perez at 3:00 a.m. on May 10, that might suggest that Mr. Perez was lying, was not at home, and/or was involved with the robbery and murder, but that still would not rule out Mr. York as also being involved with the crime. *Cf.* RT 1125-27 (Mr. Cabrera testifying that Mr. York talked about planning a robbery in which he, Mr. York, and Mr. Perez would all participate, with Mr. Perez potentially being the driver).

Nevertheless, even if not dispositive, counsel had no strategic reason not to introduce the cell phone records. The upside of the evidence outweighed any downside because it would at the very least call into question Mr. Perez's credibility. Notably, even a juror honed in on the importance of any documentary evidence on the phone call that Mr. York purportedly made to Mr.

9

Perez, asking the Court during trial (via a jury note): "Do phone records exist which confirm Mr. York called Jr. Perez on the morning of 11 May 04?"[5]  CT 298.

Accordingly, even under the doubly deferential standard that the Court applies because of the § 2254 context in which *Strickland* has been raised, the Court finds that any conclusion that defense counsel was not deficient would have been unreasonable.

2.   Alibi Witnesses

Mr. York argues that counsel was deficient not only because he failed to attack Mr. Perez's alibi but also because he failed to provide evidence that would have established an alibi for Mr. York himself.  The alibi evidence to which Mr. York refers would have been testimony from three family members: his grandmother, his mother, and his brother.  Mr. York concedes that these witnesses – because all related to him – could easily be charged with bias but points out that many of the state witnesses were related to Mr. Perez and therefore had a similar bias in favor of Mr. Perez (and, correspondingly, against Mr. York).  Mr. York presented evidence that the family members would have testified as follows:

*Eunice Mignola.*  Ms. Mignola (now deceased) was Mr. York's grandmother.  At the time of the crime, she was about 79 years old.  *See* Pet., Ex. P at 12.  According to Ms. Mignola, she went to her daughter's house in Walnut Creek (*i.e.*, Mr. York's mother's house) on May 9, 2004, because it was Mother's Day.  She arrived in the afternoon, around noon, and stayed there through about 10:45 p.m.  Mr. York was there the entire time.  *See* Pet., Ex. P at 6-7.  Mr. York drove her home around 10:45 p.m., and, then

> Kenny [*i.e.*, Mr. York] came into my house with me.  I had told the family that I had decided to remodel my kitchen and I wanted Cal York (Kenny's father) to do the job.  Kenny had been working with Cal and he sat down, we then discussed what I should do with the kitchen.  He stayed for quite a while.  I looked at the clock on my oven and was surprised to see that it was almost 10 minutes after 1 A.M.  I said to Kenny that it was so late that he should get home.  He and I said our goodbyes and he left shortly after.

---

[5] The juror appears to have made a mistake by referencing May 11 instead of May 10.  Even the prosecution recognized that mistake.  *See* RT 1774 (prosecution stating his opinion that the phone call referenced in the note was "the call at 3:00 o'clock in the morning").

Pet., Ex. N.

Ms. Mignola told Mr. York's mother about what happened, and Ms. York told her that Mr. York's attorney was aware of her testimony. However, counsel never contacted Ms. Mignola. *See* Pet., Ex. N. During Mr. York's appeal, his appellate counsel contacted trial counsel regarding Ms. Mignola. As reflected in a letter that appellate counsel wrote to Mr. York, trial counsel "was aware that your grandmother could be called, but he was concerned that she would not stand up well to rigorous cross-examination." Pet., Ex. H. Appellate counsel added: "My experience is that it is very easy for a prosecutor to convince a jury that close family members are lying when they testify for the defense." Pet., Ex. H.

*Jeannette York.* Ms. York is Mr. York's mother. She would have corroborated Ms. Mignola's testimony. According to Ms. York, Mr. York arrived at her house in the afternoon and stayed there until he drove his grandmother home around 11:00 p.m. Ms. York spoke to Ms. Mignola the following day, and Ms. Mignola commented, "'[I]sn't it nice that Kenny spent so much time with me. Not too many young people would do that.'" Pet., Ex. M. Ms. York told trial counsel about Ms. Mignola's willingness to testify at the time of Mr. York's arrest. She also raised the possibility of Ms. Mignola testifying several times thereafter. For example, during discovery, Ms. York asked counsel if he had contacted Ms. Mignola, and he responded "'that it could put Kenny' there" because "he was getting different times as far as when the crime occurred and time of death." Pet., Ex. M. When Ms. York raised the issue at trial, counsel said, "'It would look bad to have his Grandmother on the stand and that Kenny would look awful in the eyes of the jury for subjecting his Grandmother to the abuse of the DA.'" Pet., Ex. M. When the defense started presenting its case, Ms. York mentioned Ms. Mignola again and added that she could testify to back her mother up. Counsel "basically said it would look bad because she was his Grandmother and insinuated like no one would believe her. When I talked about testifying, he suggested that I should not because I'm his mother and also because the 'DA had it out for me.'" Pet., Ex. M.

*Joey York.* Joey York is Mr. York's brother, and he appears to have been in high school at the time of the crime. Joey York would have testified that Mr. York arrived at their mother's

11

house in the afternoon, around 4:30 p.m. Mr. York gave him a haircut while there and drove their grandmother home around 10:00 p.m. or 10:30 p.m.[6] *See* Pet., Ex. S.

The above testimony would not have foreclosed Mr. Perez's testimony that, at around 3:00 p.m., Mr. York and Mr. Morehead were at Mr. Perez's house (with Mr. York talking about robbing Mr. Fidler). Although Ms. Mignola indicated that Mr. York was at his mother's house around noon, his brother put Mr. York's arrival later, at 4:30 p.m. Furthermore, given the timeline provided by Joey York, it was still possible that, as Mr. Perez testified, Mr. York called Mr. Perez after leaving his place and told him that he was staking out Mr. Fidler's place and had been doing so for an hour. (Mr. Perez indicated that Mr. York and Mr. Morehead were at his place for only about 10 minutes. *See* RT 917.) Nevertheless, Ms. Mignola's testimony provided Mr. York with an alibi for the exact time that the murder was taking place, and Ms. York's testimony would have corroborated Ms. Mignola's, at least to the extent Ms. York and Ms. Mignola talked about Mr. York's spending time with his grandmother the day after Mother's Day.

The critical question thus becomes whether trial counsel was deficient in not having Ms. Mignola and Ms. York testify as alibi witnesses. As to Ms. York, the Court cannot say that it was unreasonable for counsel not to call Ms. York as a witness. Clearly, there was a strategic reason not to call her to the stand. She was not simply a biased witness because of her relationship to Mr. York (*i.e.*, his mother); instead, she was a biased witness because there was evidence from three different witnesses (*i.e.*, Mr. Perez, Ms. Perez, and Ms. Lackey) that she had called a meeting and basically counseled everyone not to disclose what had taken place. In short, it would have been easy for the prosecution to paint Ms. York as someone who was willing to do whatever was necessary to cover up the crime in order to protect her son.

As for Ms. Mignola, however, the Court reaches a different conclusion. It is certainly plausible that, had counsel interviewed Ms. Mignola, he could have reached a reasonable decision not to call her as a witness (or at least it would have been reasonable for a court to conclude such). Ms. Mignola was an elderly witness, and therefore her memory could have been challenged,

---

[6] It is not clear from the record that trial counsel was aware of Joey York's testimony. *See* also Ans. at 18. For purposes of this order, the Court assumes trial counsel had such knowledge.

especially given the conflict between her testimony and Joey York's testimony regarding Mr. York's arrival time. Moreover, Ms. Mignola's testimony – on its face – was arguably problematic from a credibility standpoint. A two-hour conversation about a kitchen remodel is questionable, not even taking into account the fact that a conversation of that length would have a 79-year-old woman stay up past 1:00 a.m. Furthermore, that Ms. Mignola happened to look at the clock at 1:10 a.m. exactly – the precise time of the murder – made her story questionable.

Nevertheless, the fact remains that trial counsel never took the time to interview Ms. Mignola. As Mr. York contends, counsel had an obligation to conduct a reasonable investigation that would enable him to make an informed decision as to whether or not Ms. Mignola should testify. *See Alcala*, 334 F.3d at 891 (stating that "[d]efense counsel must, at a minimum, conduct a reasonable investigation enabling him to make informed decisions about how best to represent his client") (internal quotation marks and emphasis omitted); *Campbell v. Reardon*, 780 F.3d 752, 764 (9th Cir. 2015) (stating that "the proper inquiry . . . is not whether it was reasonable for counsel to present the too-dark-to-identify theory, but whether the investigation supporting counsel's decision not to call [or interview] Mr. Hunter and Ms. Leonard [two disinterested eyewitnesses] was itself reasonable[;] [i]f counsel's decision not to investigate Mr. Hunter or Ms. Leonard was itself unreasonable, then his decision not to present their testimony – and to rely on the too-dark-to-identify theory instead – was too ill-informed to be considered reasonable"). Without interviewing Ms. Mignola, counsel could not have made an informed decision as to whether she could, *e.g.*, withstand a cross-examination by the prosecution. The need to interview Ms. Mignola was especially important because Mr. Perez – the second perpetrator under Mr. York's version of the events – would be offering an alibi as to whereabouts at the time of the murder. *Compare Alcala*, 334 F.3d at 891 (noting that a lawyer may make a reasonable decision that a particular investigation is unnecessary); *Campbell*, 780 F.3d at 765 (noting the same but stating that, "[b]ecause the State's case hinged on eyewitness testimony, counsel's 'decision that it was unnecessary to look for and contact such eyewitnesses cannot be described as reasonable'"). Accordingly, the Court concludes that not only was counsel deficient in not interviewing Ms. Mignola but also it would have been unreasonable for a court not to find deficient performance.

### 3. Newspaper Article

Mr. York contends that his trial counsel was also deficient in not offering evidence that would have shown that a certain newspaper article regarding the crime was not published until May 12, 2004.[7] According to Mr. York, that evidence would have put into question Mr. Perez's credibility, as well as the credibility of one of his friends, Mr. Anderson, as both testified that Mr. York arrived at the Nevada City property on May 10 or 11, 2004. Mr. York also argues that this proof would have helped his case because it would have shown that, unlike Mr. Perez, he "did not immediately flee to the Nevada City property." Pet. at 22.

Here, the Court concludes that it would not have been unreasonable for a court to find no deficient performance. Counsel could have reasonably decided not to offer the evidence as it would have done little to damage Mr. Perez and Mr. Anderson's credibility – *i.e.*, a jury could easily have concluded that Mr. Perez and/or Mr. Anderson were just mistaken about the exact date, especially as they were testifying about events that took place some five years later. In addition, counsel could have reasonably concluded that the evidence would be of minimal benefit because, even under Mr. Perez and Mr. Anderson's version of the events, it was Mr. Perez who left for the Nevada City property the morning of the crime while Mr. York did not arrive until later, including potentially the following day. That Mr. York's evidence puts his arrival day one day later is not particularly significant, especially compared to evidence that, after the murder, Mr. York actually left the Bay Area and moved to the Nevada City property.

### 4. Mr. MacDonald

Finally, Mr. York argues ineffective assistance by trial counsel because he did not call one of the identified defense witnesses, Mr. MacDonald, to the stand to testify. According to Mr. York, Mr. MacDonald would have provided testimony to rebut the testimony of Peter Chang, one of the state's witnesses. At trial, Mr. Chang, a drug dealer, testified about an incident in which he, Mr. MacDonald, and a third individual drove a Black Escalade (the same kind of car that Mr.

---

[7] Several witnesses referred to a newspaper article that Mr. York had with him on the day that he arrived at the Nevada City property. That article had a sketch of the alleged perpetrator of the crime. Mr. York has submitted evidence that the only article with a sketch in it was published on May 12, 2004.

14

1  York) to Mr. Fidler's residence so that Mr. Chang could buy drugs.  According to Mr. York, the
2  prosecution used this evidence to argue that Mr. York was the third individual and therefore knew
3  where Mr. Fidler lived, thus putting Mr. York in a position to rob Mr. Fidler.  Mr. MacDonald, if
4  called as a witness, would have testified that "I have never been in the presence of Peter Chang or
5  Kenny York at the same time" and "I never used Kenny's Escalade to meet or pick up Peter
6  Chang."[8]  Pet., Ex. O.  Thus, Mr. York contends, he could not have been the third person in the
7  car.  Mr. York contends that, because Mr. MacDonald's testimony could only have benefitted his
8  case, there was no strategic reason not to offer it.  Mr. York further suggests that the only reason
9  why counsel did not have Mr. MacDonald testify is that he was also representing Mr. MacDonald
10 at the same time in an unrelated matter.

11 As above, here, the Court concludes that it would have been reasonable for a court to find
12 performance was not deficient.  As a preliminary matter, the Court notes that there is no specific
13 evidence regarding counsel's alleged representation of Mr. MacDonald, including whether the
14 representation was for a civil or criminal matter.  Without more evidence, it is impossible to say
15 whether there could have been a conflict of interest in counsel representing both Mr. MacDonald
16 and Mr. York and/or in having Mr. MacDonald testify in Mr. York's case.  Thus, Mr. York's
17 argument that counsel decided not to have Mr. MacDonald testify for either his or Mr.
18 MacDonald's best interests (but not Mr. York's) is nothing more than speculation.[9]  *See, e.g.*, Pet.
19 at 26 (arguing that trial counsel "knew that putting MacDonald on the witness stand would force
20 [counsel] to cross-examine MacDonald about subjects that would be injurious to his duty to

---

[8] Mr. MacDonald's declaration, in which he states what his testimony would have been, states in relevant part as follows:

> I have never been in the presence of Peter Chang or Kenny York at the same time.  To my knowledge Peter and Kenny don't no [sic] ech [sic] other and have never hanged [sic] out.  I never met Peter at Blondie's pizza.  I never gave Peter a ride to pick up marijuana.  I never used Kenny's Escalade to meet or pick up Peter Chang.

Pet., Ex. O.

[9] That Mr. York's appellate counsel stated in a letter to Mr. York that Mr. Cardoza's representation of Mr. MacDonald "raises the potential for a claim that he had a conflict between [Mr. MacDonald's] interests and your interests," Pet., Ex. H, is not to the contrary.

15

1    zealously represent his client").

2        Moreover, counsel could reasonably have opted not to call Mr. MacDonald for several
3    reasons. First, Mr. Chang never claimed that Mr. York was the third person in the car. In fact,
4    Mr. Chang testified that he had never met Mr. York. *See* RT 863. That being the case, there was
5    nothing for Mr. MacDonald to rebut. Second, Mr. MacDonald's declaration, in which he states
6    what he would have testified to, reflects grounds for not calling him as a witness. Notably, Mr.
7    MacDonald never testified that he did not know where Mr. Fidler lived (*e.g.*, as a result of his
8    dealings with Mr. Chang). If Mr. MacDonald knew where Mr. Fidler lived, there would be a basis
9    for Mr. York to know even if he was not the third person in the car because Mr. MacDonald and
10   Mr. York were friends.

11       5.    Summary

12       For the foregoing reasons, the Court agrees with Mr. York that it would have been
13   unreasonable for a court not to find deficient performance based on (1) trial counsel's failure to
14   offer Mr. York's cell phone records as evidence and (2) trial counsel's failure to interview Ms.
15   Mignola. However, the other deficiency grounds raised by Mr. York lack merit under the AEDPA
16   standard of review.

17   D.    Prejudice

18
19   > To establish prejudice under *Strickland*, "[t]he likelihood of a different result must be substantial, not just conceivable." On AEDPA habeas review, "[i]nstead of considering whether [the petitioner] met the burden of proving prejudice, [a court] must decide whether the state post-conviction court was reasonable in determining that [he] was not prejudiced."
20
21

22   *Zapata v. Vasquez*, 788 F.3d 1106, 116 (2015). In short, the question is whether "the state court's
23   prejudice analysis was contrary to, or an unreasonable application of, *Strickland*'s prejudice
24   prong." *Id. See, e.g.*, *Brown v. Williams*, 597 Fed. Appx. 417, 418 (9th Cir. 2015) (stating that,
25   "[g]iven the substantial additional evidence presented at trial that is unaffected by [petitioner's]
26   ineffective assistance claims . . . [,] it was not unreasonable for the Nevada Supreme Court to
27   conclude that [petitioner's] evidence of prejudice fell short of proving that it was reasonably likely
28   that the result would have been different if [his] counsel had taken a different approach"); *Murray*

*v. Schriro*, 746 F.3d 418, 466 (9th Cir. 2014) ("agree[ing] . . . that the overwhelming evidence of guilt forecloses any credible argument that the outcome of the trial would have been affected by the proffered exculpatory evidence"; "[t]he implausibility of the proffered exculpatory version of events and the strength of the inculpatory evidence both bolster the state court's finding under the doubly deferential AEDPA review applicable to [ineffective-assistance-of-counsel] claims").

Here, the Court cannot say that a conclusion of no *Strickland* prejudice would have been unreasonable. Even though Mr. Perez clearly had an interest in casting Mr. York as the second perpetrator, and many of the witnesses who implicated Mr. York as the second perpetrator were aligned with Mr. Perez, there were at least two "independent" witnesses who held no allegiance to Mr. Perez over Mr. York, namely, Mr. Hart and Mr. Olson. Each provided testimony consistent with Mr. Perez's – *e.g.*, that Mr. York talked about something bad happening while he was with an African American man and/or that Mr. York burned clothing. Moreover, one witness, Ms. Morales, who was aligned with Mr. York in terms of a personal relationship, also provided evidence probative of Mr. York's guilt. While the testimony of these three witnesses was not free of any criticism – for instance, Mr. Hart and Mr. Olson somewhat equivocated and/or backtracked in their trial testimonies and Ms. Morales's testimony was not overly specific – that testimony still buttressed the fact that Mr. York was involved in the robbery and murder. The Court also notes that, contrary to what Mr. York argues in his papers, at the end of the day, it may not have been an either/or proposition before the jury; that is, the jury was not necessarily faced with deciding whether the second perpetrator was either Mr. York or Mr. Perez. Given the record, it is possible that the jury could have believed Mr. Perez was actually involved with the robbery and murder in some way (*e.g.*, as a driver) but that fact would not have thereby absolved Mr. York of also being involved.

Accordingly, the Court concludes that Mr. York is not entitled to habeas relief.

E.   Request for Evidentiary Hearing

As a final point, the Court acknowledges Mr. York's request for an evidentiary hearing. Mr. York, however, has failed to explain why he is entitled to an evidentiary hearing, particularly after the Supreme Court's decision in *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011). As explained

17

by the Ninth Circuit,

> [i]n *Cullen v. Pinholster*, the Supreme Court held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits," and thus "evidence introduced in federal court has no bearing on § 2254(d)(1) review." Thus, for claims that were adjudicated on the merits in state court, petitioners can rely only on the record before the state court in order to satisfy the requirements of § 2254(d). This effectively precludes federal evidentiary hearings for such claims because the evidence adduced during habeas proceedings in federal court could not be considered in evaluating whether the claim meets the requirements of § 2254(d). We recognized this implication in *Stokley v. Ryan*, where we held that *Pinholster* "directly bar[red]" a petitioner's demand for an evidentiary hearing on an ineffective assistance claim because the new evidence could not be considered on habeas review.

*Gulbrandson v. Ryan*, 738 F.3d 976, 993-94 (9th Cir. 2013). Notably, in *Gulbrandson* itself, the Ninth Circuit concluded that, because the state court's rejection of petitioner's ineffective-assistance-of-counsel claims were neither contrary to nor involved unreasonable applications of *Strickland*, *Pinholster* barred the district court "from any further factual development on these claims." *Id.* at 994.

Accordingly, pursuant to *Pinholster* and binding Ninth Circuit authority, the Court denies Mr. York's request for an evidentiary hearing.

### III.   CONCLUSION

For the foregoing reasons, the Court denies Mr. York's petition for a writ of habeas corpus. In addition, the Court denies a certificate of appealability. This is not a case in which "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Clerk of the Court shall enter judgment in accordance with the above and close the file in the case.

**IT IS SO ORDERED**.

Dated: December 21, 2015

_____
EDWARD M. CHEN
United States District Judge